Curtis B. **CAMPBELL** and Inez Preece Campbell, Plaintiffs and Appellants,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,** Defendant and Appellee.

No. 910436–CA.

Court of Appeals of Utah.

Aug. 13, 1992.

**132**

L. Rich Humpherys and Karra J. Porter, Salt Lake City, for plaintiffs and appellants.

Glenn C. Hanni and Robert A. Burton, Salt Lake City, for defendant and appellee.

Before BENCH, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Appellants Curtis B. Campbell and Inez Preece Campbell appeal from the district court's grant of summary judgment in favor of appellee State Farm Mutual Automobile Insurance Company. The pivotal issue raised by this appeal is whether State Farm's eventual payment of the excess judgment rendered against the Campbells in a suit by a third party bars the Campbells' claim that State Farm acted in bad faith by earlier refusing to settle the claim within the policy limits. We hold that it does not bar the Campbells' claim and, accordingly, reverse and remand for further proceedings.

## FACTS

■ We note at the outset that, insofar as any of the following facts are contested, we recount them as the Campbells allege they occurred because, on appeal from a grant of summary judgment, we must view the facts in a light most favorable to the losing party. As stated in *Webster v. Sill*, 675 P.2d 1170 (Utah 1983), "[d]oubts or uncertainties concerning issues of fact properly presented, or the nature of inferences to be drawn from the facts, are to be construed in a light favorable to the party opposing the summary judgment." *Id.* at 1172. Moreover, we note that the issue of whether an insurer breached its duty to act in good faith turns on factual issues to be determined by a jury after consideration of all the evidence. *Gagon v. State Farm Mut. Auto. Ins. Co.*, 746 P.2d 1194, 1197 (Utah App.1987), *cert. denied*, 771 P.2d 325 (Utah 1988).

The Campbells are a retired, elderly couple who, at all relevant times, have been residents of rural Cache County, Utah. Curtis Campbell was the driver of a "non-contact" vehicle involved in an accident on May 22, 1981; Mrs. Campbell rode as a passenger in the vehicle. The accident occurred when Campbell attempted to pass, or had just passed, a caravan of six vans travelling on a two-lane highway through Sardine Canyon in Cache County, Utah. Todd Ospital, the son of John L. and Winnifred P. Ospital (the Ospitals), drove a small car coming the opposite direction. He swerved onto the shoulder of the highway apparently in an attempt to avoid the Campbell vehicle. Ospital lost control of his vehicle, veered over the center line, and collided head-on with a vehicle driven by Robert G. Slusher. Todd Ospital was killed in the accident and Slusher was seriously injured. Campbell's vehicle was unscathed.

Slusher sued both Campbell and Todd Ospital's estate, in the First District Court of Cache County, for the injuries he sustained in the accident. Slusher's claim against Ospital's estate was settled prior to trial. Ospital's estate, however, had asserted a crossclaim against Campbell for wrongful death. Thus, the Slusher and Ospital claims against Campbell remained to be tried.[1] The cause of the collision was disputed, and Campbell steadfastly denied any responsibility for the accident. At the time of the accident, the Campbells were insured under an automobile insurance policy issued by State Farm.

---

1. The final disposition of these claims can be found in *Slusher v. Ospital*, 777 P.2d 437 (Utah 1989).

State Farm assigned Ray Summers to investigate and evaluate the claim. Summers was an experienced claims adjuster who had worked for State Farm in that capacity since 1963. After some initial investigation, Summers concluded that Campbell was at least partly at fault for the accident. All the eyewitnesses to the accident believed that Campbell had been the cause of the accident, and the physical evidence, including photographs of the scene and skidmarks, supported the eyewitnesses' conclusions. In addition, all the evidence pointed to no fault whatsoever on the part of Slusher. Considering his conclusions about Mr. Campbell's fault, Summers was concerned that Campbell was in considerable danger of being exposed at trial to a judgment exceeding his policy limits of $25,000 per person and $50,000 per accident. Summers so concluded for several reasons. First, the accident had resulted in the death of Todd Ospital. Second, Slusher's injuries were obviously very serious, considering that his medical costs had already reached $25,000 and he had sustained some injuries that were permanent. Thus, Summers concluded that the prudent course would be to settle the matter, if possible, because a trial would likely result in an excess judgment against Campbell. To make matters worse, under then-existing law, Campbell would be jointly and severally liable for the whole of any such judgment if he were found at fault to even a small degree.[2]

Summers reported his findings and evaluation to his superiors at State Farm. After reviewing Summers' report, one of his supervisors directed Summers to destroy that portion of the report relating to Campbell's culpability, and to redraft that portion to assess no fault against Campbell. Summers claimed that, although he strongly disagreed with this directive, he cooperated because he feared he might lose his job if he did not. Moreover, he asserts that while working on other cases, he had been given similar directions to act in a manner he believed was contrary to the best interests of the insured. Summers has further opined that any claims adjuster would have known that an excess judgment against a retired, older couple such as the Campbells would "cause extreme emotional upset, stress and suffering and could permanently affect their financial security and physical well-being." [3]

Thereafter, State Farm resolutely stood by its position of "no liability," in spite of Summers' evaluation of the accident. State Farm retained Wendell Bennett to undertake the defense of Campbell. Prior to trial, State Farm and Bennett continued to reassure the Campbells that there was no evidence to support a finding of liability against Campbell and that there was no danger of the couple being exposed to a judgment beyond their policy limits. In-

---

2. At the time of Campbell's trial, the Comparative Negligence Act, Utah Code Ann. § 78–27–40, –41 (1977) (repealed by 1986 Utah Laws ch. 199, §§ 4, 5), provided that each defendant was liable for the whole of the judgment, regardless of the percentage of fault attributable to him. In 1986, the Legislature enacted the Liability Reform Act. Thus, Utah law now provides: "[T]he maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant." Utah Code Ann. § 78–27–40 (1992).

3. State Farm moved to strike Summers' affidavit containing these allegations, claiming the affidavit suffered from several evidentiary defects, including statements not based on personal knowledge and opinions on ultimate legal questions. The trial court apparently never ruled on this motion, likely viewing it as unnec-

essary in light of its conclusion that the Campbells had no cause of action. We likewise find it unnecessary to rule on the motion to strike since it is our opinion that the Campbells may avoid summary judgment even without the allegations contained in Summers' affidavit.

Moreover, State Farm generally questions the credibility of Summers, whose employment was terminated by State Farm in 1982. Summers thereafter unsuccessfully sued State Farm for wrongful termination and employment discrimination. *See Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700 (10th Cir.1988). State Farm thus alleges Summers is merely a disgruntled former employee seeking revenge against State Farm. While these events may indeed put Summers' credibility at issue, the credibility of witnesses is, of course, a matter for the factfinder to weigh, and may not be judged by a reviewing court considering the propriety of summary judgment.

deed, Bennett assured the Campbells there was "plenty" of insurance to cover the risk. While this view was not inconsistent with Campbell's personal view that he was in no way responsible for the accident, neither State Farm nor Bennett ever advised Campbell of the existence of numerous witnesses who would testify against him, or that he would be legally liable for the entire amount of the judgment if he were adjudged even partially at fault.

While awaiting the trial, Slusher and the Ospitals indicated to State Farm on numerous occasions their willingness to settle their claims for the policy limits of $25,000 each. The Ospitals even evidenced a willingness to settle for less than the policy limits, in order to avoid the daily reliving of the death of their son through a long and unpleasant trial. State Farm refused their offers.

Thus, trial was held in September 1983. At trial, Campbell heard for the first time the expert and eyewitness testimony against him. Horrified at this turn of events, Campbell inquired of Bennett why he had not been notified of this adverse testimony. Bennett simply told Campbell "not to worry," and that he would take care of everything. The jury found Campbell 100% at fault for the accident and rendered verdicts totalling $253,957[4] against Campbell.[5] Reeling from the shock of the large verdict against him, Campbell asked Bennett what would happen next. Bennett advised Campbell, "put a 'for sale' sign on your place," and stated that State Farm would pay the policy limits, but the rest would be up to Campbell. News of the verdict spread throughout the commu-

nity, with the help of the local State Farm office, which posted a newspaper account of the verdict to induce other customers to purchase higher policy limits. Campbell felt a corresponding chill in his relationships with both social and business acquaintances.[6]

Following the trial, State Farm made a motion for a new trial or, in the alternative, a judgment notwithstanding the verdict. This motion was denied. Thereafter, judgments were entered in favor of Slusher and the Ospitals; the judgments reflected $70,000 in offsets against the jury awards.[7] State Farm then appealed the judgment against Campbell.

Meanwhile, the Campbells had retained independent counsel to represent them in the matter of the excess judgment. Approximately two months after trial, Slusher, the Ospitals, and Campbell all demanded that State Farm pay the full amount of the excess judgment. In response, State Farm, on November 23, 1983, at last offered Slusher and the Ospitals the policy limits of $25,000 each, but continued to refuse to pay any of the excess judgment. Slusher and the Ospitals, holding judgments totalling approximately $200,000, understandably declined State Farm's offer. The Campbells began providing information to their attorneys concerning what assets they owned which might satisfy the judgment. In an attempt to forestall execution on the Campbells' assets, their attorney met with counsel for Slusher and the Ospitals in January of 1984, to discuss the possibility of a settlement of the excess judgments. In this regard, State Farm

---

4. A verdict in favor of Slusher in the amount of $200,000, and a verdict in favor of the Ospitals in the amount of $53,957, constituted the total judgment against Campbell.

5. The trial was seemingly no "close call," considering the memorandum decision issued by the trial court denying Campbell's motion for judgment notwithstanding the verdict, or a new trial, or a reduction in the verdict. The court therein commented that it agreed with the jury findings and would have found likewise, the only disagreement being that the court thought the amount of damages awarded was too small. See Slusher v. Ospital, 777 P.2d 437, 445 (Utah

1989) (quoting trial court's memorandum decision).

6. We reiterate that our recitation of the facts is the Campbells' version; Bennett and State Farm dispute nearly all of it. Nevertheless, given the posture of the case and the disputed material facts, we must view the facts as the Campbells assert them.

7. The Slusher judgment reduced the jury award by $67,000 to reflect benefits received by Slusher through other insurance policies. The Ospital judgment likewise reduced the jury verdict by $3,000.

points out that a March, 1984, letter from counsel for Slusher confirmed that no attempt would be made to execute on the Campbells' property unless a settlement agreement could not be reached. No such settlement was consummated, however, until nearly one year later, in December of 1984.[8]

For nearly three years after the September, 1983, judgment was entered, State Farm never offered, or even intimated, that it would be willing to pay anything more than the $50,000 policy limits. Rather, State Farm expressly stated in a May, 1984, letter to Campbell that, if the judgment were affirmed by the Utah Supreme Court, State Farm would pay only the policy limits in partial satisfaction of the judgment, in addition to interest on the entire judgment and costs. Finally, in February, 1986, State Farm did offer to pay the Slusher and Ospital judgments in full; however, this offer was conditioned upon the Campbells' releasing any claims of bad faith which they might have against State Farm. This offer was rejected.[9]

The Campbells, along with Slusher and the Ospitals, initially filed suit against State Farm for bad faith in July of 1986. State Farm responded by filing a motion to dismiss in August, 1986, wherein it declared that a bad faith cause of action would never accrue because "the moment judgment is affirmed on appeal, assuming the Supreme Court does affirm, State Farm will immediately pay the judgment in full, together with all interest and costs." Thus, the first time that State Farm indicated an unconditional willingness to pay the excess judgments was in August, 1986,

approximately three years after the entry of judgment against Campbell. In April of 1987, the Slusher's and Ospital's bad faith actions against State Farm were dismissed with prejudice; the Campbells' action was dismissed without prejudice, pending the final disposition of the underlying action against Campbell. Ultimately, on June 23, 1989, the Supreme Court affirmed the two judgments against Campbell,[10] and State Farm paid the excess judgments with interest and costs on July 28, 1989.

## COURSE OF PROCEEDINGS

The Campbells instituted the present action against State Farm in August of 1989, claiming State Farm breached the duty it owed them in several respects. Specifically, the Campbells claimed, among other things, that State Farm breached its duty to them by improperly investigating the third-party claims against them, unreasonably refusing to settle the claims, misrepresenting its evaluation of the claims and the corresponding danger of exposure to an excess judgment, and generally acting in its own economic interest to the detriment of their interests. Thus, the Campbells alleged State Farm's conduct amounted to: 1) a breach of the implied covenant of good faith and fair dealing; 2) the tort of bad faith; 3) a breach of fiduciary duty; 4) fraudulent misrepresentation; and 5) intentional infliction of emotional distress.

Accordingly, the Campbells sought damages for their expenses incurred for independent counsel, loss of business, and miscellaneous out-of-pocket expenses. In addition, the Campbells sought recovery for emotional distress, including depression,

---

8. Essentially, the agreement provided that Slusher and the Ospitals would not execute on the Campbells' personal assets in order to satisfy their judgments, in return for the Campbells' promise to pursue a bad faith claim against State Farm. The fruit of such a claim, if any, was to be applied first to the expenses of litigation and to satisfy the judgments in favor of Slusher and the Ospitals. Any recovery above that amount would be distributed as follows: 45% to Slusher, 45% to the Ospitals, and 10% to the Campbells.

9. State Farm alleges that this offer, and its later unconditional offer of settlement, were never

communicated to the Campbells by their attorney and, thus, any emotional distress suffered by the Campbells was caused by their own counsel. It is unclear from the record whether the Campbells take issue with this contention, which has its origin in Mr. Campbell's deposition. However, even if true, it has no bearing on any emotional distress or other injury suffered by the Campbells during the years prior to these offers.

10. See Slusher v. Ospital, 777 P.2d 437, 445 (Utah 1989).

suicidal tendencies, embarrassment, humiliation, and damage to reputation, allegedly caused by the unnecessary trial, the entry of the excess judgment against Campbell, and the resulting financial insecurity. Moreover, the Campbells claimed to have experienced physical injury attributable to their extreme emotional upset, including high blood pressure and aggravation of Parkinson's disease. The Campbells also claimed that State Farm's malicious, deliberate, and conscious disregard of their interests warranted the imposition of punitive damages.

State Farm moved for summary judgment in April of 1990, arguing the Campbells had failed to state a cause of action for bad faith because 1) an action for bad faith could not have arisen while appeal of the underlying judgment was pending because the judgment was not yet "final";[11] and 2) following affirmance of the underlying judgment, State Farm had paid the entire judgment against the Campbells and, thus, the Campbells were never "exposed" to excess liability. Essentially, State Farm argued the Campbells had never suffered any legally cognizable damages.

The Campbells opposed State Farm's summary judgment motion. In their supporting memorandum, the Campbells first argued that State Farm's eventual payment of the excess judgment did not cure its earlier bad faith conduct. The Campbells alleged they suffered injury apart from the excess judgment itself, and were thereby entitled to recover damages for emotional distress and punitive damages. Thus, the Campbells contend State Farm's payment of the judgment served only to mitigate the Campbells' damages by compensating them for one element of their injury. Second, the Campbells argued there were sufficient facts alleged to support their other claims, including intentional infliction of emotional distress and fraudulent misrepresentation, and their prayer for punitive damages. Moreover, the Campbells pointed out that the "undis-

puted" facts contained in State Farm's memorandum differed in several respects from the Campbells' version. In particular, the Campbells disputed several facts relevant to State Farm's behavior in handling the claim against them, and to their fear and anxiety following the entry of judgment against Mr. Campbell. The Campbells also brought out several facts, bearing on State Farm's alleged omissions and misrepresentations to the Campbells, which were not mentioned in State Farm's memorandum. The Campbells thus contended that these disputed issues of material fact precluded a grant of summary judgment to State Farm.

State Farm, in its reply memorandum, rebutted many of the Campbells' factual contentions, and argued these factual disputes were irrelevant because, as a legal matter, State Farm's payment of the excess judgment precluded the Campbells' claim of bad faith. In addition, State Farm argued the Campbells' other causes of action should likewise be dismissed since they all stemmed from the same allegation: that State Farm had, in bad faith, failed to settle the third-party claims against Mr. Campbell. Thus, State Farm claimed, the Campbells had but one cause of action, with differing damages theories, and each and every cause of action should be dismissed.

The district court agreed with State Farm's primary legal argument and, therefore, despite the existence of numerous factual disputes, granted State Farm's motion for summary judgment in February of 1991. The court concluded that, irrespective of how unreasonably an insurer acted in refusing to settle a third-party claim against its insured, no cause of action for bad faith exists if the insurer immediately satisfied the entire excess judgment when it became final. The court then granted summary judgment to State Farm on all of the Campbells' claims.

---

11. It appears from the record that State Farm did not post a supersedeas bond on appeal. Thus, Slusher and the Ospitals would have been free to execute upon their judgments against Campbell, notwithstanding the fact that the judgments were being appealed, until the time when they reached an accord among themselves.

## STANDARD OF REVIEW

 We note at the outset that a challenge to a grant of summary judgment presents for review only conclusions of law because summary judgment, by definition, does not resolve factual issues. Utah R.Civ.P. 56(c); *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990). We therefore review the trial court's legal conclusions supporting the grant of summary judgment for correctness, according them no particular deference. *Allen v. Ortez*, 802 P.2d 1307, 1309 (Utah 1990); *Landes*, 795 P.2d at 1129. Moreover, we must look at the facts and inferences to be drawn therefrom in the light most favorable to the losing party. *Webster v. Sill*, 675 P.2d 1170, 1172 (Utah 1983). The grant of summary judgment may stand only if there is no genuine issue of material fact and "the moving party is entitled to judgment as a matter of law." Utah R.Civ.P. 56(c); *Allen*, 802 P.2d at 1309.

## I. BAD FAITH REFUSAL TO SETTLE

On appeal, State Farm continues to argue that when an insurer refuses to settle a third-party claim against the insured, and an excess judgment is entered against the insured, but the insurer eventually pays the excess judgment, the insured, as a matter of law, cannot maintain an action for bad faith, irrespective of the insurer's other conduct. We disagree. Rather, we agree with the Campbells' contention that the insurer's payment of the excess judgment surely mitigates the insured's damages, but there may indeed be other legally cognizable damages sustained by the insured which were not remedied by the insurer's eventual payment of the judgment. While this precise issue appears to be one

of first impression in Utah, prior Utah Supreme Court cases discussing an insurer's duty to its insured in the third-party context and recoverable damages for a breach of that duty, compel the conclusion we reach.

### A. Tort Action Available For Insurer's Breach of Fiduciary Duty to Defend Insured

The Utah Supreme Court, in *Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985), discussed at considerable length the duty which an insurer owes its insured, both in the "first-party" and the "third-party" contexts.[12] *Beck* was a first-party case, wherein the insured sued its insurer for bad faith refusal to settle the insured's claim. The Court held that the insured had a cause of action against the insurer for a breach of the implied contractual obligation to perform a first-party insurance contract in good faith.[13] *Id.* at 798. The Court then acknowledged the existence of a duty of good faith, owed by the insurer to its insured, and characterized that duty as requiring, "at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Id.* at 801. The duty also requires an insurer to " 'deal with laymen as laymen and not as experts in the subtleties of law and underwriting' and to refrain from actions that will injure the insured's ability to obtain the benefits of the contract." *Id.* (quoting *MFA Mut. Ins. Co. v. Flint*, 574 S.W.2d 718, 720 (Tenn.1978)). Finally, the Court reasoned that a breach of the duty of good faith in the first-party context gives rise to a claim that is more properly stated in contract

---

12. "A 'third-party' situation is one where the insurer contracts to defend the insured against claims made by third parties against the insured." *Beck*, 701 P.2d at 798 n. 2. Liability policies and the liability provisions of automobile policies are examples. In contrast, a "first-party" situation is one "where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured." *Id.* Medical

insurance and the "collision" and "comprehensive" provisions of automobile policies are examples.

13. In so doing, the Court declared that "to the extent that [*Lyon v. Hartford Accident and Indem. Co.*, 25 Utah 2d 311, 480 P.2d 739 (1971)] is philosophically inconsistent with our recognition today of a cause of action in contract, it is overruled." *Beck*, 701 P.2d at 798 n. 1.

than in tort.[14] *Id.* at 800.

In the third-party context, on the other hand, an insured may state a cause of action in tort for an insurer's breach of its obligations. *Id.* at 799. The Court explained that different considerations are present in the third-party context which compel the recognition of a tort cause of action. *Id.* In the third-party context, an insurer is obligated to defend the insured against claims by others. Thus, the insurer owes a "fiduciary duty to its insured to protect the insured's interests as zealously as it would its own." *Id.* Accordingly, Utah law allows an insured to sue an insurer in tort to remedy a violation of that duty. *Id.* This higher duty is imposed on the insurer because in a third-party situation, the insurer "controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf." *Id.* The insured is thus "wholly dependent" on the insurer to see that the insured's interests are protected. *Id.* If the insurer does not act in good faith, the insured may be exposed to a judgment that exceeds the insurance policy limits. *Id.* The insurance contract thus "creates a fiduciary relationship because of the trust and reliance placed in the insurer by its insured." *Id.*

Moreover, the Court pointed out that an insurer acts as an agent for the insured with respect to the disputed claim. *Id.* Thus, in addition to the duties arising from the parties' contractual obligations, "the law imposes upon all agents a fiduciary obligation to their principals with respect to matters falling within the scope of their agency." *Id.* at 800.

## B. Insurer's Duty to Defend Includes Good Faith Duty to Settle

■ Part of the insurer's implied duty to its insured is to zealously guard the insured's interests when deciding whether to accept an offer of settlement of the third-party's claim or to take the case to trial.[15] Stated generally, an insurer owes its insured a duty to accept an offer of settlement within the policy limits when there is a substantial likelihood of a judgment being rendered against the insured in excess of those limits. *Larraburu Bros. v. Royal Indem. Co.*, 604 F.2d 1208, 1211–1212 (9th Cir.1979). The test of the insurer's conduct is one of reasonableness.[16] *Id.* at 1212;

---

14. The Court thus rejected the reasoning of other jurisdictions which permit an insured to sue an insurer in tort for failing to negotiate in good faith in a first-party situation. *See, e.g., Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 486, 510 P.2d 1032, 1038 (1973); *Bibeault v. Hanover Ins. Co.*, 417 A.2d 313, 319 (R.I.1980). The Court recognized, however, that the conduct which constituted a breach of contract might also give rise to separate causes of action in tort, such as intentional infliction of emotional distress or fraud. *Beck*, 701 P.2d at 800 n. 3.

15. Some courts have gone further and held that the insurer has an affirmative duty to initiate settlement negotiations if the third party has made no settlement offers. *See, e.g., Guarantee Abstract & Title Co. v. Interstate Fire & Casualty Co.*, 228 Kan. 532, 618 P.2d 1195, 1199 (1980); *Ranger County Mut. Ins. Co. v. Guin*, 723 S.W.2d 656, 659 (Tex.1987). We need not address this issue because in this case the third parties promptly made offers to settle within the policy limits.

16. Courts have articulated various standards for a finding of "bad faith," some requiring an element of willfulness or recklessness, *see, e.g., Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 393 N.W.2d 161, 164 (Mich.1986) (insurer liable for arbitrary, reckless, indifferent, or intentional disregard of the insured's interests), and others holding that merely negligent conduct will suffice. *See, e.g., Kabatoff v. Safeco Ins. Co. of America*, 627 F.2d 207, 209 (9th Cir.1980) (insurer liable if it failed, negligently or in bad faith, to settle). In practice, however, these formulations of the test of the insurer's conduct tend to coalesce; courts claiming to hold an insurer liable only for bad faith have held insurers liable for failure to settle in an appropriate case, even though the failure was attributable solely to negligence. *See* Allan D. Windt, *Insurance Claims and Disputes* § 5.13 (2d ed. 1988). We prefer the more objective formulation of courts which inquire whether the insurer's decision was reasonable or unreasonable under all the circumstances. *See, e.g., deVries v. St. Paul Fire and Marine Ins. Co.*, 716 F.2d 939, 943 (1st Cir.1983) (approving standard "in between negligence and malice,"—touchstone is "reasonableness"). Thus, irrespective of whether the insurer's unreasonable decision not to settle resulted from willful misconduct or simple ineptitude, the insurer has violated the duty of good faith owed to the insured. Moreover, we think this formulation is consistent with the essentially objective test of good faith conduct in the context of first-party insurance

*Memphis Bank & Trust Co. v. Tennessee Farmers Mut. Ins. Co.*, 619 S.W.2d 395, 397 (Tenn.App.1981); *Crisci v. Security Ins. Co.*, 66 Cal.2d 425, 58 Cal.Rptr. 13, 16–17, 426 P.2d 173, 176–77 (1967). As regards offers of settlement, the insurer must give the insured's interests at least as much consideration as it gives its own. *Larraburu*, 604 F.2d at 1212; *Gibson v. Western Fire Ins. Co.*, 682 P.2d 725, 730 (Mont.1984).[17] If the insurer breaches this duty, Utah law provides the insured with a cause of action in tort. *See Beck*, 701 P.2d at 799.

### C. Eventual Payment of Excess Judgment Does Not Foreclose Action

■ Based on this formulation of an insurer's duty, and the Utah Supreme Court's discussion in *Beck*, we conclude for several reasons that an insurer's eventual payment of an excess judgment does not necessarily vitiate the insured's cause of action for breach of the duty of good faith. First, *Beck* expressly recognized that a third-party bad faith action is properly stated in tort and, thus, the full panoply of tort damages might be provable and recoverable by an insured in any given case.[18] As the Utah Supreme Court recognized, an insured may purchase insurance not only to provide funds, but to provide peace of mind. *Beck*, 701 P.2d at 802. *See also Rawlings v. Apodaca*, 151 Ariz. 149, 155, 726 P.2d 565, 571 (1986) (benefit of insurance contract is peace of mind from fear of

economic catastrophe). Therefore, contrary to State Farm's assertion, the insured's exposure to an excess judgment is not the only legally cognizable damage to which an insured might be entitled. Rather, the amount of the excess judgment itself, as well as damages for injury to reputation or credit rating, damages for emotional distress, and punitive damages are all potentially recoverable by an insured.[19] Thus, it is clear as a matter of simple logic, as well as law, that the insurer cannot avoid liability by eventually paying the excess judgment if damages apart from the judgment have been proximately caused by the insurer's unreasonable failure to settle. In such a case, payment of the judgment may mitigate or limit the insured's damages, but it does not retroactively erase damages already sustained.

■ Second, we agree with those authorities that have concluded it is the unreasonable failure to settle the third-party claim in the first place, not the later failure to pay the resulting excess judgment, which breaches the insurer's duty and causes injury to the insured. *See Larraburu Bros. v. Royal Indem. Co.*, 604 F.2d 1208, 1214 (9th Cir.1979); Allan D. Windt, *Insurance Claims and Disputes* § 5.19 (2d ed. 1988). Accordingly, it is the insurer's conduct at the time a settlement could have been effected which determines whether the insurer breached its duty to the insured. *Id.* Thus, State Farm's argument, that an insurer does not act in bad faith so long as it

claims, that is, an insurer who denies a claim has acted in "good faith" so long as the claim was "fairly debatable." *See Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah App.1987).

17. In order to give more definite contours to these tests, some courts have enumerated specific factors to be considered when deciding whether an insurer acted in good faith when it rejected an offer of settlement, including whether it was likely that a verdict greatly in excess of the policy limits would be rendered, whether a verdict for the defendant on liability was doubtful, and whether the insured demanded that the insurer settle within the policy limits. *See, e.g., Gibson*, 682 P.2d at 736–37.

18. In fact, the Court in *Beck* declared that, even in a first-party case, it had "no difficulty with

the proposition that, in unusual cases, damages for mental anguish might be provable." *Beck*, 701 P.2d at 802. The Court reasoned that such consequential damages might be foreseeable and provable because it is "axiomatic that insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries." *Id.*

19. This conclusion seems to us a natural outgrowth of earlier Utah law which recognized that the mere entry of an excess judgment against the insured, whether or not the insured actually pays the judgment, constitutes a real damage because of the potential for harm to the insured's credit rating and in the form of liens on the insured's property. *Ammerman v. Farmers Ins. Exch.*, 22 Utah 2d 187, 450 P.2d 460, 462 (1969).

pays the final excess judgment, frames the insurer's duty too narrowly, as one of mere reimbursement of the insured for liability incurred.

It is true that the insurer's principal duty, under the express terms of the insurance contract, is to pay the liability that the insured incurs, up to a specified dollar limit. The implied duty of good faith and fair dealing goes beyond the bare contract, however, and gives meaning and substance to the insurer's obligations. As the Utah Supreme Court has made clear, the heart of the insurer's fiduciary duty, when handling third-party claims against its insured, is to guard the best interests of the insured as zealously as it would its own. If the insurer's decision to reject offers of settlement and go to trial is unreasonable, it is at that time that the breach of duty occurs, which is the crux of the insured's cause of action for bad faith.[20] Eventual payment of the excess judgment does not compensate the insured for emotional injury, damages to the insured's reputation and credit rating, any punitive damages awarded against the insured, or any other legally cognizable injury stemming from the insurer's failure to settle. Nor does it "cure" the insurer's earlier wrongful conduct.[21] Our conclusion is bolstered by first-party cases holding that an insurer's belated payment of a claim after intentionally refusing to pay it does not negate the insurer's liability for bad faith. *See, e.g., Berry v.*

*United of Omaha,* 719 F.2d 1127, 1129 (11th Cir.1983); *Harvey v. General Tire & Rubber Co.,* 153 Cal.App.3d 1015, 200 Cal. Rptr. 722, 731 (1984); *Rawlings,* 151 Ariz. at 156–57, 726 P.2d at 572–73. The *Berry* court analogized the insurer's bad faith refusal to settle the insured's claim to the tort of conversion, noting that return of the converted property does not bar a suit for conversion, but goes merely to reducing the damages. *Berry,* 719 F.2d at 1129. *See also* Restatement (Second) of Torts § 922(1) (1979).

■ Third, in accordance with our focus on the insurer's settlement conduct, we think that allowing an insurer to absolve itself of its earlier breach of duty by paying the judgment years later does not adequately encourage an insurer to properly discharge its fiduciary duty. Were we to decide that the insurer's fiduciary obligation would be satisfied by merely paying the excess judgment, we would transform the insurance policy into a mere contract of indemnity. As previously noted, the implied duty of good faith and fair dealing demands more than this. It imposes a fiduciary duty upon the insurer because of the trust and reliance placed in the insurer by its insured, and renders the insurer answerable in tort to remedy a breach of that duty.

Thus, in accordance with existing Utah law, our decision reinforces a policy of giving an insurer every incentive to treat the

---

**20.** Furthermore, we point out that this statement is not inconsistent with our view that the insured's cause of action does not accrue until final disposition of the underlying claim against the insured. In this regard, we agree with the *Larraburu* court that the final disposition of the case against the insured is critical evidence, though not in and of itself determinative, of whether the insurer's refusal to settle within the policy limits was unreasonable. *See Larraburu,* 604 F.2d at 1214–15. Thus, until final disposition of the underlying claim, an insured may not know whether he has a "colorable" claim that the insurer's conduct was unreasonable. *Id.* at 1215. Nevertheless, the fact "[t]hat [the insured] must await final disposition of the original action to determine whether he has a colorable claim against the insurer does not alter the fact that the conduct alleged to be unreasonable occurred at an earlier stage of the original lawsuit, and that the unreasonable conduct can be a

proximate cause of injury before the final disposition as well as after." *Id.*

**21.** Considering the reality of modern litigation, which can span many years, it is clear to us that injuries such as emotional distress might be inflicted during the time between an insurer's decision not to settle the third-party claim, and the insurer's payment of the excess judgment after its becoming "final" on appeal. In a particular case, several years may elapse between the insurer's decision not to settle and the actual trial. The trial itself may take considerable time. An appeal of the judgment against the insured may take several more years. Thus, an insurer's payment of the judgment after affirmance on appeal might not make whole an insured who has been living for years with an excess judgment hanging overhead with no assurance that his insurer would take responsibility for the judgment.

insured properly in the first instance, rather than encouraging a belated attempt to right a previous wrong by paying an excess judgment which should never have come into existence. As the Kansas Supreme Court stated, "all the good faith and settlement offers in the world *after* suit [against the insured] is filed will not immunize a company from the consequences of an unjustified refusal to [settle] which made the suit necessary." *Smith v. Blackwell,* 14 Kan.App.2d 158, 791 P.2d 1343, 1347 (1989) (quoting *Sloan v. Employers Casualty Ins. Co.,* 214 Kan. 443, 521 P.2d 249, 251 (1974)). *See also Knoblock v. Royal Globe Ins. Co.,* 38 N.Y.2d 471, 381 N.Y.S.2d 433, 437, 344 N.E.2d 364, 368 (1976) (belated offer of settlement on eve of trial, which was rejected, is relevant to bad faith issue, but will not always exonerate the insurer).[22]

State Farm also argues that allowing an insured to state a bad faith claim under the circumstances of this case will result in a "flood" of litigation by insureds who endure the stress of a trial, whether or not judgments exceeding the policy limits are rendered against them. State Farm's focus on the inevitable stress and trauma suffered by an insured when a case is taken to trial is misplaced. The proper focus is on the insurer's decision to reject offers of settlement and instead proceed to trial. We require only that the insurer's decision not to settle be a reasonable one. If it is, then no amount of suffering caused by the ordeal of a trial and entry of judgment will give an insured a cause of action in bad faith.[23]

### D. Propriety of Summary Judgment in This Case

█ Turning to the case before us, it is clear that there are material facts in this case, both disputed and undisputed, which, if believed, might lead a jury to conclude that State Farm acted in bad faith. First, Slusher and the Ospitals offered on more than one occasion to settle at or below the insurance policy limit and State Farm rejected those offers. As a result, a judgment greatly exceeding the policy limit was entered against Campbell. Second, the Campbells allege that State Farm ignored its own agent's recommendation to settle, which recommendation was reasonably based on substantial evidence of Campbell's responsibility for the accident and the clear danger of an excess judgment considering the death and severe injury which resulted. Third, the Campbells allege that State Farm failed to properly apprise them of relevant facts and circumstances: State Farm did not tell the Campbells about the eyewitness and expert testimony against Campbell; State Farm did not warn the Campbells of the danger that a judgment

22. In addition to condemn the *Larraburu* decision, State Farm cites several cases holding that there is no cause of action in bad faith when the insurer has paid the excess judgment. *See, e.g., Clement v. Prudential Property & Casualty Ins. Co.,* 790 F.2d 1545, 1547–48 (11th Cir. 1986) (applying Florida law); *Fidelity & Casualty Co. v. Cope,* 462 So.2d 459, 461 (Fla.1985); *Heninger v. Foremost Ins. Co.,* 175 Cal.App.3d 830, 221 Cal.Rptr. 303, 305–06 (1985); *Kricar Inc. v. General Accident, Fire & Life Ins. Corp.,* 542 F.2d 1135, 1136 (9th Cir.1976) (applying Oregon law). We reject these cases, first, because Florida and Oregon frame the insurer's duty more narrowly as sounding only in contract, not tort. *See Clement,* 790 F.2d at 1547; *Kricar,* 542 F.2d at 1136. Thus, courts interpreting Florida or Oregon law understandably might view payment of the excess judgment as a complete remedy for the insured. Second, these cases appear to assume without explanation that the entry of an excess judgment is the only legally cognizable damage that an insured

suffers when the insurer unreasonably refuses to settle a third-party claim. Moreover, the conclusion these cases reach seems at odds with the principles governing an insurer's duties and an insured's remedies as they were enunciated in *Beck.*

23. Moreover, State Farm seems to ignore the fact that an insured who is ultimately victorious against a third party or who incurs a judgment below the policy limits would have great difficulty stating a claim for bad faith. While our decision does not completely rule out that possibility, the existence of an excess judgment is the single most important indicia that an insurer's decision not to settle within the policy limits was unreasonable. Conversely, the entry of judgment below the policy limits is compelling evidence that the insurer acted with sound judgment. Thus, the chances of an insured successfully maintaining a claim for bad faith in the face of such evidence would appear to be slim indeed.

far in excess of the policy limits might be entered against Campbell; and State Farm did not warn the Campbells that they would be jointly and severally liable for the entire judgment even if Campbell were found only partially at fault. Rather, State Farm falsely assured the Campbells there was no evidence against Campbell and no danger of exposure beyond their policy limits. Moreover, the Campbells allege that State Farm affirmatively acted to deceive them by destroying Summers' candid report of his evaluation of the case against Campbell. Finally, after the trial, State Farm completely disclaimed any responsibility for the excess judgment, instead, through counsel, advising its aged, retired insureds to put a "for sale" sign on their farm.

State Farm points out that Mr. Campbell allegedly insisted he was not to blame for the accident and that this at least partially explains State Farm's decision to go to trial. The insured's demand (or lack thereof) that the case be settled certainly is relevant to a determination whether the insurer wrongfully refused to settle. However, Mr. Campbell alleges that he was not properly apprised of the strength of the case against him and the likelihood of a large excess judgment being entered against him. These are material issues of fact which must be resolved by the trier of fact upon remand.

Viewing these disputed facts in the light most favorable to the Campbells, as we must, we think that a jury could reasonably conclude that State Farm violated the implied duty of good faith it owed to the Campbells. Thus, the Campbells are entitled to an opportunity to prove that State Farm acted in bad faith and that, as a result, they suffered damages, including emotional distress, proximately caused by State Farm's alleged breach, and to prove they are entitled to punitive damages.[24] Accordingly, while State Farm's subsequent payment of the excess judgment may have served to mitigate the damages flowing from its alleged bad faith conduct, it does not nullify the Campbells' bad faith cause of action.[25]

## II. AGREEMENT BETWEEN THE CAMPBELLS, THE OSPITALS, AND SLUSHER

State Farm also argues the Campbells' bad faith claim should be barred by the agreement the Campbells made with the Ospitals and Slusher.[26] We disagree. Like State Farm's eventual payment of the excess judgment, the agreement insulating the Campbells from liability for payment of the judgment does not cure the alleged bad faith conduct of State Farm. However, the agreement is certainly relevant to the Campbells' damages. Insofar as this agreement served to ease the Campbells' minds, it may have lessened the extent of their claimed emotional distress. However, a fair amount of time passed between the entry of the excess judgment against Campbell and finalization of the agreement, during which time the Campbells may have continued to suffer emotional upset. Thus, the Campbells assert that the agreement's effect on their claimed emotional distress is an issue for the factfinder to weigh. Like State Farm's eventual payment of the judgment, the existence of this agreement does not necessarily vitiate the Campbells' cause of action.

24. Of course we hold only that the Campbells are entitled to an opportunity to prove they are entitled to such damages; we do not hold they have done so. Punitive damages require conduct that is willful and malicious, or manifesting a knowing and reckless indifference and disregard toward the rights of others. *See, e.g., Johnson v. Rogers,* 763 P.2d 771, 774 (Utah 1988).

25. One author discussing damages for bad faith failure to settle a third-party claim notes that in very few cases have insureds recovered damages beyond the amount of the excess judgment itself. *See* Kenneth S. Abraham, *Distributing Risk* 192 (1986). Be that as it may, that fact does not undermine our decision that, as a matter of law, an insured may state a bad faith claim though the insurer has paid the excess judgment. We leave the difficulties of proof relating to the insurer's conduct and the insured's damages to the Campbells and the trier of fact.

26. *See supra* note 8.

## III. THE CAMPBELLS' OTHER CAUSES OF ACTION

█ In addition to the Campbells' claim that State Farm breached the implied covenant of good faith and fair dealing, they claim State Farm's conduct also gave rise to other causes of action, including breach of fiduciary duty, fraudulent misrepresentation, and intentional infliction of emotional distress. As State Farm has pointed out, all of the Campbells' claims are derived from the same conduct: State Farm's failure to settle the case within the policy limits. Because we have concluded that the actionable wrong is the failure to settle, not the failure to pay the resulting judgment and, thus, that the Campbells have a cause of action for breach of the covenant of good faith, the Campbells are entitled to an opportunity to pursue their other causes of action stemming from the same allegedly wrongful conduct.[27]

## CONCLUSION

The Campbells are entitled to pursue a cause of action against State Farm for breach of the covenant of good faith and fair dealing, based on State Farm's allegedly unreasonable refusal to settle the case against them within policy limits, notwithstanding the fact that State Farm paid the resulting excess judgment years later, after its affirmance on appeal. The Campbells are likewise entitled to an opportunity to pursue their additional claims arising from the same allegedly wrongful conduct. Accordingly, we reverse and remand for trial or other appropriate proceedings consistent with this opinion.

BENCH and GREENWOOD, JJ., concur.

---

27. We decline to address State Farm's argument that Mrs. Campbell lacks standing to pursue these claims, finding it to be without merit. Furthermore, in view of our resolution of the primary issue in this case, the Campbells' argument that they needed additional time for discovery need not be addressed.