508 S.E.2d 75 (1998)
203 W.Va. 358
STATE of West Virginia ex rel. ALLSTATE INSURANCE COMPANY, a Foreign Corporation, Defendant Below, Petitioner,
v.
The Honorable Martin J. GAUGHAN, Judge of the Circuit Court of Ohio County, West Virginia and Carol J. Thoburn, Defendant Below, Respondents.
No. 24510.
Supreme Court of Appeals of West Virginia.
Submitted January 13, 1998.
Decided July 14, 1998.
*80 Walter M. Jones, III, E. Kay Fuller, Dale Buck, Martin & Seibert, L.C., Martinsburg, West Virginia, Attorneys for Petitioner.
Robert P. Fitzsimmons, Jacob M. Robinson, Michael W. McGuane, Thomas C. Schultz, Wheeling, West Virginia, Attorneys for Respondents. *76 *77 *78
*79 DAVIS, Chief Justice:
This writ of prohibition was filed by petitioner/defendant below, Allstate Insurance Company (hereinafter "Allstate"), seeking to restrain the enforcement of two discovery orders entered by the respondent, Honorable Martin J. Gaughan, Judge of the Circuit Court of Ohio County. Allstate contends that the circuit court exceeded its authority by requiring Allstate to produce and disclose to respondent/plaintiff below, Carol J. Thoburn (hereinafter "Ms. Thoburn"), (1) all written complaints made against Allstate nationwide from 1986 to the present and all nationwide advertising files and advertising materials shown or disseminated by Allstate from 1986 to the present, (2) all documents evidencing sanctions filed against Allstate by any regulatory agency nationwide from 1990 to present, and (3) specific claim files that Allstate asserts are protected by the attorney-client privilege. Additionally, Allstate seeks to prevent further disclosure of an alleged attorney-client document inadvertently disclosed to Ms. Thoburn. For the reasons discussed below, the writ of prohibition is granted as moulded.

I.

FACTUAL AND PROCEDURAL HISTORY
This case originates from a personal injury suit filed by Ms. Thoburn against one of Allstate's insureds, Timothy Mirandy. In 1991, Ms. Thoburn was a passenger in a car that was hit by a vehicle driven by Mr. Mirandy. Ms. Thoburn sustained injuries from the accident. She subsequently filed a personal injury action against Mr. Mirandy.
Allstate evaluated the claim against its insured, Mr. Mirandy. Allstate offered to settle the matter for $20,000. Ms. Thoburn rejected the offer and proposed settling the claim for the policy limit of $100,000. Allstate rejected Ms. Thoburn's offer to settle the personal injury claim. On June 24, 1995, a jury returned a verdict in favor of Ms. Thoburn, awarding her $229,500.[1] In August, 1995, Allstate paid the judgment on behalf of its insured, Mr. Mirandy.
On May 1, 1996, Ms. Thoburn filed the instant underlying bad faith action against *81 Allstate. Ms. Thoburn's bad faith claims[2] were based upon Allstate's refusal to settle the personal injury case against Mr. Mirandy for the policy limit of $100,000, before the jury returned its verdict.[3] The bad faith causes of action were based upon Allstate's alleged violations of W.Va.Code § 33-11-4(9).[4] The record presently before the Court does not identify the specific subsections of W.Va.Code § 33-11-4(9) which Ms. Thoburn asserts were violated by Allstate.
During discovery in the bad faith case against Allstate, Ms. Thoburn served Allstate with a request to produce: (1) all written complaints made in West Virginia against Allstate from 1986 to the present, (2) all advertising files and advertising materials shown or disseminated in West Virginia by Allstate from 1986 to the present, (3) all documents evidencing all sanctions filed against Allstate in West Virginia by any regulatory agency from 1990 to present, and (4) the complete investigative claim file maintained by Allstate relating to the action Ms. Thoburn instituted against Mr. Mirandy.
Allstate produced some of the requested documents maintained in Mr. Mirandy's claim file. In producing those documents, Allstate inadvertently supplied a document it claimed to be protected by the attorney-client privilege. Ms. Thoburn then filed a motion to compel the production of all documents requested by her pleadings. After a hearing on the motion to compel, the circuit court entered two orders which required Allstate to produce (1) all written complaints made nationwide against Allstate from 1986 to the present,[5] (2) all nationwide advertising files and advertising materials shown or disseminated by Allstate from 1986 to the present,[6] (3) all documents evidencing all sanctions filed against Allstate on a nationwide basis by any regulatory agency from 1990 to present,[7] and (4) specific claim file documents involving the personal injury action instituted by Ms. Thoburn against Mr. Mirandy.[8] The *82 circuit court also denied a request by Allstate for a protective order preventing further disclosure of and preventing the use of the alleged attorney-client document inadvertently provided to Ms. Thoburn. From the orders, Allstate now seeks a writ of prohibition.

II.

STANDARD OF REVIEW
This Court has held that "[a] writ of prohibition will lie where the trial court does not have jurisdiction or, having jurisdiction, exceeds its legitimate powers." Syl. pt. 4, Pries v. Watt, 186 W.Va. 49, 410 S.E.2d 285 (1991). See also, Syl. Pt. 3, State ex rel. McCartney v. Nuzum, 161 W.Va. 740, 248 S.E.2d 318 (1978), overruled on other grounds, In re Katie S., 198 W.Va. 79, 479 S.E.2d 589 (1996). We stated in syllabus point 1 of State ex rel. USF & G v. Canady, 194 W.Va. 431, 460 S.E.2d 677 (1995) that:
In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance. Syl. Pt. 1, Hinkle v. Black, 164 W.Va. 112, 262 S.E.2d 744 (1979).[9]
This Court has also declared that "[a] writ of prohibition is available to correct a clear legal error resulting from a trial court's substantial abuse of its discretion in regard to discovery orders." Syl. Pt. 1, State Farm Mutual Automobile Insurance Co. v. Stephens, 188 W.Va. 622, 425 S.E.2d 577 (1992). "When a discovery order involves the probable invasion of confidential materials that are exempted from discovery under Rule 26(b)(1) and (3) of the West Virginia Rules of Civil Procedure, the exercise of this Court's original jurisdiction is appropriate." Syl. pt. 3, State ex rel. USF & G v. Canady, 194 W.Va. 431, 460 S.E.2d 677 (1995).[10]

III.

DISCUSSION

A.

Nationwide Production of Documents
The circuit court compelled the nationwide production by Allstate of all written complaints made against Allstate from 1986 to *83 present. The circuit court also compelled the nationwide production of all regulatory sanctions filed against it from 1990 to present. Allstate contends that the requirement for the nationwide production of written complaint information and all types of regulatory sanction information is too broad, burdensome and cumulative. To support its claim that the circuit court has abused its discretion on the requirements for a nationwide production of documents, Allstate cites our decision in Stephens.
In Stephens the plaintiff requested information on all bad faith, unfair trade or settlement practices, and excess verdict claims filed against State Farm throughout the entire country for a ten year period. The Stephens plaintiffs also requested nationwide data on all complaints filed against State Farm with insurance industry regulators for the same period. The defendants objected to the request on the grounds that the requested information was too broad, burdensome, irrelevant, and cumulative. This Court held in syllabus point 2 of Stephens that "[u]nder Rule 26(b)(1)(iii) of the West Virginia Rules of Civil Procedure, a trial court may limit discovery if it finds that the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation."[11]
It was stated in syllabus point 3 of Stephens that:
Where a claim is made that a discovery request is unduly burdensome under Rule 26(b)(1)(iii) of the West Virginia Rules of Civil Procedure, the trial court should consider several factors. First, a court should weigh the requesting party's need to obtain the information against the burden that producing the information places on the opposing party. This requires an analysis of the issues in the case, the amount in controversy, and the resources of the parties. Secondly, the opposing party has the obligation to show why the discovery is burdensome unless, in light of the issues, the discovery request is oppressive on its face. Finally, the court must consider the relevancy and materiality of the information sought.
Ultimately, in Stephens this Court found the nationwide discovery ordered by the trial court to be an abuse of its discretion. This Court indicated that on remand the circuit court should consider statewide application of the discovery requests.
Factually and legally, Stephens is controlling on the nationwide discovery requirements in the instant proceeding. Neither the circuit court orders, nor the record in this case, demonstrate any analysis performed by the trial court in applying the Stephens test. There are no findings of fact, nor conclusions of law, set forth in either discovery order, which illustrates that the court weighed the requesting parties need to obtain the information against the burden that producing the information places on the opposing party. There were no findings of fact, nor conclusions of law setting forth an analysis of the issues in the case, the amount in controversy, and the resources of the parties. Finally, there are no findings of fact or conclusions of law, setting forth the relevancy and materiality of the information sought. The question presented by the lack of findings on this issue, is whether findings should be clearly set forth in non-appealable interlocutory orders presented to this Court by means of an extraordinary writ. This issue is one of first impression for this Court.
To begin, it is important to note that the orders in this case were based upon discovery motions. Rule 52(a) of the West Virginia Rules of Civil Procedure states that "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in subdivision (c) of this rule." (Emphasis added.) This Court qualified Rule 52(a) with respect to Rule 56 summary judgment orders in syllabus point 3 of Fayette County Nat. Bank v. Lilly, 199 W.Va. 349, 484 S.E.2d 232 (1997), wherein it was held that:

*84 Although our standard of review for summary judgment remains de novo, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.
In Romer v. Green Point Savings Bank, 27 F.3d 12 (2d Cir.1994) the appellate court observed that under Rule 52(a) of the federal rules of civil procedure a district court was not required to issue an order containing findings, with respect to a request for a temporary restraining order. However, the court observed that:
TROs are exempted from the requirement of express findings presumably because they are characteristically issued in haste, in emergency circumstances, to forestall irreparable harm, are of quite limited duration, and are exempt from appellate review. Nonetheless, courts should not be excessively tied to labels. In the rare instance like this one, where the TRO will dispose of all that is at stake in the litigation, it is highly useful for the district court to make findings to explain its ruling.... [W]ithout findings to explain the district court's action, the court of appeals will have difficulty understanding the basis of the ruling and determining whether the district court applied the law correctly.
Id., 27 F.3d at 16. Similarly, in United States v. Shaheen, 445 F.2d 6 (7th Cir.1971), the court held that for appellate review purposes findings had to be made even though Rule 52(a) did not require findings for a ruling on a writ ne exeat republica. See also, Bennion v. Pennzoil Co., 826 P.2d 137 (Utah 1992) (holding that in order to facilitate appellate court's review of judgment certified as final for purposes of interlocutory appeal, trial court should henceforth enter findings supporting conclusion that such orders are final).
Our research has not uncovered a case which directly addresses the necessity of providing findings in a non-appealable interlocutory order presented to an appellate court by means of an extraordinary writ. However, we note that the general rule regarding the appeal of an appealable interlocutory order, requires the trial court to set forth its findings of fact and conclusions of law. See Geisenhoff v. Geisenhoff, 693 So.2d 489 (Ala. Civ.App.1997); Safadi v. Thompson, 226 Ga. App. 685, 487 S.E.2d 457 (Ga.App.1997); Pawlus v. Bartrug, 109 Ohio App.3d 796, 673 N.E.2d 188 (Ohio App. 9 Dist.1996); Pepe Intern. Development Co. v. Pub Brewing Co., 915 S.W.2d 925 (Tex.App.-Hous.1996); Mariello v. Giguere, 667 A.2d 588 (Me.1995); Sunset Pools of St. Louis, Inc. v. Schaefer, 869 S.W.2d 883 (Mo.App.1994); Responsible Citizens v. Superior Court, 16 Cal.App.4th 1717, 20 Cal.Rptr.2d 756 (1993); Burns v. Alderman, 122 Idaho 749, 838 P.2d 878 (Idaho App.1992); Willie's Const. Co., Inc. v. Baker, 596 N.E.2d 958 (Ind.App.1992); Morris v. Wilson, 600 So.2d 306 (Ala.Civ.App. 1992); Skalbeck v. Agristor Leasing, 384 N.W.2d 209 (Minn.App.1986); Rowe v. Rowe, 74 N.C.App. 54, 327 S.E.2d 624 (N.C.App. 1985); Garriffa v. Taylor, 675 P.2d 1284 (Wyo.1984); Westberry v. Reynolds, 134 Ariz. 29, 653 P.2d 379 (Ariz.App.1982); Lanphere v. Beede, 141 Vt. 126, 446 A.2d 340 (Vt.1982); Nottingham v. Tempel, 509 P.2d 1290 (Colo.App.1973). When a court is under no duty to make findings on an interlocutory order, courts have placed the burden on the complaining party to request the court issue an order containing adequate findings. See Conoco Inc. v. Baskin, 803 S.W.2d 416 (Tex. App.-El Paso 1991); G & S Business Services, Inc. v. Fast Fare, Inc., 94 N.C.App. 483, 380 S.E.2d 792 (N.C.App.1989); Telerent Leasing Corp. v. Equity Associates, Inc., 36 N.C.App. 713, 245 S.E.2d 229 (N.C.App. 1978); Mize v. Sims, 516 S.W.2d 561 (Mo. App.1974).
The purpose of findings of fact and conclusions of law is to provide an appellate court with a clear understanding of the lower court's decision. See Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316, 60 S.Ct. 517, 520, 84 L.Ed. 774 (1940); Glover v. Johnson, 855 F.2d 277, 284 (6th Cir. 1988); Wynn Oil Co. v. Purolator Chem. Corp., 536 F.2d 84, 85 (5th Cir.1976). It also serves the purpose of prompting the lower court "to fully and conscientiously consider *85 the basis for [the] decision." Finney v. Arkansas Bd. of Correction, 505 F.2d 194, 212 n. 15 (8th Cir.1974). We believe that the general rationale for requiring findings be set out in appealable interlocutory orders, supports a requirement that findings be clearly set forth in non-appealable interlocutory orders presented to this Court through extraordinary writs. Therefore, we hold that a party seeking to petition this Court for an extraordinary writ based upon a non-appealable interlocutory decision of a trial court, must request the trial court set forth in its order findings of fact and conclusions of law that support and form the basis of its decision. In making the request to the trial court, counsel must inform the trial court specifically that the request is being made because counsel intends to seek an extraordinary writ to challenge the court's ruling. When such a request is made, trial courts are obligated to enter an order containing findings of fact and conclusions of law. Absent a request by the complaining party, a trial court is under no duty to set out findings of fact and conclusions of law in non-appealable interlocutory orders.
In the instant proceeding the orders do not set out findings of fact and conclusions of law, consistent with a Stephens analysis which will inform this Court of its reasoning in requiring production of documentation of all nationwide complaints, nationwide production of all regulatory sanctions filed against Allstate and the production of nationwide advertising and advertising materials by Allstate. In view of our holding today, we remand the nationwide discovery issue for the purpose of having the trial court set out findings of fact and conclusions of law consistent with the Stephens inquiry.

B.

Claim File Documents
The circuit court required Allstate to release 66 documents that Allstate alleged were protected by the attorney-client privilege and/or work product doctrine. "The burden of establishing the attorney-client privilege or the work product exception, in all their elements, always rests upon the person asserting it." Syl. pt. 4, State ex rel. USF & G v. Canady, 194 W.Va. 431, 460 S.E.2d 677 (1995). Moreover, we have recognized that
[a]s the attorney-client privilege and the work product exception may result in the exclusion of evidence which is otherwise relevant and material and are antagonistic to the notion of the fullest disclosure of the facts, courts are obligated to strictly limit the privilege and exception to the purpose for which they exist.
Id. at 438, 460 S.E.2d at 684. However, the importance of obtaining full disclosure of the facts must be balanced with a client's need to speak freely with his or her attorney so that he or she may obtain quality advice. Id. at 438-39, 460 S.E.2d at 684-85 (recognizing that it is "`the function of a court to mediate between [these two competing interests,] assigning, so far as possible, a proper value to each'" (citation omitted)). Furthermore, acknowledging the apparent tension between "the substantial deference normally accorded to" a circuit court's discovery rulings and "the preference to bar privileged materials from discovery," we have held that "[w]hen a circuit court's discovery ruling with respect to privileged materials will result in the compelled disclosure of those materials, a hard and more stringent examination will be given... to determine if the circuit court abused its discretion." Syl. pt. 5, Id.
The facts of this particular case do not fit neatly within the analytical framework designed for traditional application of the attorney-client privilege/work product doctrine. The present issue, which is also one of first impression for this court, involves the question of whether Allstate, as the insurer, can assert the attorney-client privilege/work product doctrine in a third-party bad faith action, to prevent Ms. Thoburn from obtaining specific documents from the file of Allstate's insured, Mr. Mirandy.[12] Particularly *86 noteworthy, however, is the fact that Ms. Thoburn secured a release from Mr. Mirandy which permitted Ms. Thoburn access to his file.
Our analysis begins by reviewing the decisions of other jurisdictions which have decided this issue. Generally, courts have recognized two broad categories of bad faith settlement actions against insurers:[13] first-party bad faith actions and third-party bad faith actions. The terms "first-party" and "third-party" have distinctively different meanings in the context of bad faith settlement actions against insurers. For definitional purposes, a first-party bad faith action is one wherein the insured sues his/her own insurer for failing to use good faith in settling a claim brought against the insured or a claim filed by the insured.[14] A third-party bad faith action is one that is brought against an insurer by a plaintiff who prevailed in a separate action against an insured tortfeasor.[15] In the bad faith action against the *87 insurance company the third-party alleges the insurer insurance company engaged in bad faith settlement in the first action against the insured tortfeasor.[16]See Palmer by Diacon v. Farmers Ins. Exchange, 261 Mont. 91, 861 P.2d 895, 905 (Mont.1993). The principles that are discussed in this opinion with respect to the attorney-client privilege and work product rule apply exclusively to third-party bad faith settlement actions against insurers.[17] In third-party bad faith actions against insurers, there is a split of authority among the jurisdictions addressing the issue as to the application of the attorney-client privilege/work product rule. Therefore, we shall examine and discuss each position.

1. The Minority View
The minority view, held by only one jurisdiction, addresses the attorney-client privilege and the work product rule together and concludes that they do not attach to the file of an insured in a third-party bad faith action against an insurer. Therefore, the entire file of an insured is accessible to discovery in a third-party bad faith suit against an insurer. The minority rule was clearly articulated in Dunn v. National Security Fire & Casualty Co., 631 So.2d 1103 (Fla.App. 5 Dist.1993).[18] The trial court in Dunn denied the plaintiff access to the claim file of an insured during a third-party bad faith suit against the insured's insurer. One of the reasons for the denial was the potential violation of the attorney-client privilege/work product rule. The *88 appellate court observed, as an initial matter, that the communication in the insured's claim file should be viewed in two ways: post-judgment communication and prejudgment communication.
As to post-judgment communication in a claim file, Dunn held that "memos or documents in the file after date of the judgment can be obtained with a showing of good cause." Dunn, 631 So.2d at 1109 (emphasis in original) (citation omitted). While Dunn did not expressly hold that the attorney-client privilege/work product rule had no application to post-judgment communication, it is apparent by the "good cause" showing that neither privilege automatically attaches to post-judgment communication.
Dunn's response to prejudgment claim file communication was unequivocal. The opinion held:
In bad faith suits against insurance companies for failure to settle within the policy limits, all materials in the insurance company's claim file up to the date the judgment in the underlying suit are obtainable, and should be produced when sought by discovery....
Discovery of the insurer's claim file and litigation file is allowed in a bad faith case over the objections of the insurer that production of the file would violate the work product or attorney/client privilege. The rationale is because the injured third party "stands in the shoes" of the insured party in a third party bad faith case and the insurer owed a fiduciary duty to its insured.
Dunn, 631 So.2d at 1109 (citations omitted).
We do not hesitate in rejecting the minority approach to the issue of whether an insurer has standing to invoke the attorney-client privilege and work product rule in an attempt to prevent disclosure of the contents of an insured's file in a third-party bad faith action. The minority position is unsound. It seriously undermines the relationship between an insured and insurer. By overemphasizing a party's right to obtain disclosure of evidence to prove a third party claim of bad faith, the minority neglects the importance of "full and frank consultation between a client and a legal advisor [without] the fear of compelled disclosure of information." State ex rel. USF & G v. Canady, 194 W.Va. at 438, 460 S.E.2d at 684.

2. The Majority View
While the majority of courts have developed separate standards regarding the application of attorney-client privilege and the work product rule in third-party bad faith actions, they have generally concluded that an insurer has standing to assert the attorney-client privilege or the work product rule in an effort to prevent disclosure of the contents of the file of its insured in a third-party bad faith action against the insurer. This view opines that "[i]t is well established that the attorney hired by the insurer to represent its insured, actually is representing both the insurer and the insured." State ex rel. USF & G Company v. The Montana Second Judicial District Court, 240 Mont. 5, 783 P.2d 911, 913 (Mont.1989), citing American Mutual Liability Ins. Co. v. Superior Court, 38 Cal.App.3d 579, 113 Cal.Rptr. 561 (1974); Rogers v. Robson, 74 Ill.App.3d 467, 30 Ill. Dec. 320, 392 N.E.2d 1365 (1979); Longo v. American Policyholders' Ins. Co., 181 N.J.Super. 87, 436 A.2d 577 (1981). In Jessen v. O'Daniel, 210 F.Supp. 317, 331-332 (D.Mont.1962) the court stated that "[u]nder an insurance contract ... the insurer initially employs the attorney to represent the interests of both the insured and the insurer." (Emphasis in original). Having set forth the general rationale behind the majority's conclusions regarding the application of the attorney-client privilege and the work product rule in third-party bad faith actions, we address the specific doctrines in turn, beginning with the attorney-client privilege.
a. The Attorney Client Privilege. The court in State ex rel. USF & G Company v. The Montana Second Judicial District Court, supra, stated best the position taken by the majority in attaching the attorney-client privilege to the file of an insured in a third-party bad faith action against an insured.[19] The court stated:

*89 Normally, all communications between attorney and client, including conversations on phone calls, are memorialized in writing. If these writings are all potentially discoverable, the impact on an attorney's ability to fully advise a client would be devastating. An insurance company must have an honest and candid evaluation of a case, possibly including a "worst case scenario." A concern by the attorney that communications would be discoverable in a bad faith suit would certainly chill open and honest communication. An attorney's inability to communicate freely with the client would impede all communications and could diminish the attorney's effectiveness. It could also impede settlements.
State ex rel. USF & G Company v. The Montana Second Judicial District Court, 783 P.2d at 916.[20]See also Campbell v. State Farm Mut. Auto. Ins. Co., 840 P.2d 130 (Utah Ct.App.1992).
This Court is not persuaded by the majority view to the extent that it provides an insurer with all the protections of the attorney-client privilege with respect to an insured's claim file in third-party bad faith actions. We believe that the majority view seriously impedes a third-party's ability to prove a bad faith claim. Thus, it does not strike the necessary balance between a client's need to speak freely with his or her attorney and the importance of obtaining full disclosure of the facts in third-party bad faith litigation. See State ex rel. USF & G v. Canady, 194 W.Va. at 438-39, 460 S.E.2d at 684-85. Having rejected the minority view earlier in this opinion, we now find it necessary to craft a more practical approach to the discovery of documents held by an insurer in a claim file related to one of its insured. Such an approach must adequately protect the attorney/client relationship; yet, provide third parties with a reasonable opportunity to prove the elements of a claim for bad faith. To reach this more practical approach, we believe that a middle ground must be established between the minority and majority positions on this issue.
First, it must be recognized that the majority view artificially clothes an insurer with the attorney-client privilege.[21] The majority view reasons that the insurer hires the attorney to represent both the insured and insurer. In reality, the insurer actually hires the attorney to represent the insured. Even so, we believe that an insurer should be permitted a "quasi attorney-client privilege" with respect to the claim file of an insured in a third-party bad faith action. Especially where, as here, the insured has executed a release of the claim file to a third-party suing an insurer in a bad faith action.[22] We therefore hold that in a third-party bad faith action where an insured has signed a release of his/her claim file to a third-party litigant, an insurer may raise a quasi attorney-client privilege to communication in the insured's claim file. The quasi attorney-client privilege belongs to the insurer, not the insured, and may be waived only by the insurer.
Second, we must carefully articulate the parameters of the quasi attorney-client privilege herein established. As an initial *90 matter, we note that an attempt to protect from disclosure documents in a claim file that were prepared prior to the filing of a third-party's underlying suit against the insured is properly maintained by asserting the work product rule, which will be discussed in the next section. Consequently, we hold that all communications in an insured's claim file that were generated prior to the filing date of a third-party's underlying complaint against the insured are not protected by the quasi attorney-client privilege. All communications in an insured's claim file generated on and after the filing date of a third-party's complaint against an insured, are presumptively quasi attorney-client privilege communications.
Furthermore, we note that prior to the filing of a third-party's underlying suit against the insured, the majority of documents in the claim file would not fulfill the elements required to gain protection under the attorney-client privilege. Conversely, after the filing of the underlying suit, the number of documents subject to the attorney-client privilege radically increases. While a general request for discovery of documents prepared prior to the underlying suit against the insured may be appropriate, as most of those documents would be undisputably discoverable, we believe such a general request made with respect to documents prepared after the filing of the underlying suit would unduly burden the court by requiring it to examine a multitude of documents that would ultimately be subject to the attorney-client privilege. We therefore hold that where a third-party has obtained a release from the insured giving the third-party access to all communications in the insured's claim file, in order for the third-party to seek discovery of communications in the claim file generated on or after the date the third-party filed his/her complaint against the insured, the third-party must provide some reasonable description of each communication he/she seeks that was generated on or after the date the third-party filed his/her complaint against the insured. In other words, the third-party may not merely request all communication in the claim file generated on or after the filing date of the complaint against the insured.[23] Thereafter, if the insurer raises the quasi attorney-client privilege to such specifically requested communication, the insurer must prove the elements of the traditional common law attorney-client privilege for each communication it seeks to shield from discovery through assertion of the quasi attorney-client privilege.[24] The trial court must then make an independent determination for each communication the insurer seeks to shield from discovery. If the trial court determines that some or all of the specifically requested communication has been shown to satisfy the elements of the traditional common law attorney-client privilege, then such communication is protected from disclosure by the quasi attorney-client privilege. We note, however, that if the insurer fails to establish all the elements of the traditional common law attorney-client privilege for any specifically requested communication, such communication must be produced to the third-party.[25]
Traditional attorney-client privileged material is virtually undiscoverable under Rule 26(b) of the West Virginia Rules of Civil Procedure.[26] However, applying such complete *91 protection to documents subject to the quasi attorney-client privilege herein created for the unique situation presented by third-party bad faith suits is inequitable. Often, the plaintiff in a third-party bad faith suit has no reasonable means of proving his or her claim without the benefit of certain documents contained in the claim file. In order to temper this unduly harsh result, and to advance the balance between the competing interests of full disclosure of the facts and open attorney-client communication, we hold that a third party may, in some instances, obtain discovery of documents found to be protected by the quasi attorney-client privilege. To obtain such documents, the third-party must show a "compelling need" for each communication that has been found to be protected from disclosure by the quasi attorney-client privilege.[27] To satisfy the quasi attorney-client privilege compelling need test, the third-party must show that (1) the specifically requested protected communication cannot reasonably be obtained elsewhere and (2) that the specifically requested protected communication could reasonably be interpreted by the fact finder as tending to prove an element of the bad faith cause of action or (3) that the specifically requested protected communication could reasonably be used to lead to the discovery of facts that tend to prove an element of the bad faith cause of action. Any protected communication for which the third-party satisfies the quasi attorney-client privilege compelling need test must be produced to the third-party.[28]
b. The Work Product Rule. At the outset, we note that the work product rule traditionally operates to protect documents prepared in anticipation of litigation. See, e.g., Syllabus point 7, State ex rel. United Hosp. Center, Inc. v. Bedell, 199 W.Va. 316, 484 S.E.2d 199 (1997) ("To determine whether a document was prepared in anticipation of litigation and, is therefore, protected from disclosure under the work product doctrine, the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation."). Thus, in the context of third-party bad faith litigation, the rule necessarily applies only to documents prepared prior to the initiation of the third-party's underlying suit against the insured.[29]
The majority of courts allow an insurer to invoke the work product rule when documents are sought from an insured's file by a third-party in a bad faith action against the insurer. The court in Askew v. Hardman, 918 P.2d 469 (Utah 1996),[30] succinctly outlined the majority's guidelines for permitting the work product rule to be invoked by an insurer seeking to prevent disclosure of documents in an insured's file to a third-party suing an insurer in a bad faith action. The Askew court stated:
... The question remains, however, to what extent documents in an insurance claim file can qualify for work-product protection.
In considering whether documents in an insurance claim file are prepared in anticipation of litigation, courts have taken one of three general positions. Some courts *92 have held that unless a document is prepared by an attorney, the document is not subject to work-product protection. See, e.g., Thomas Organ Co. v. Jadranska Slobodna Plovidba, 54 F.R.D. 367, 372 (N.D.Ill.1972)....
Some courts have taken the position that all documents in an insurance claim file are prepared in anticipation of litigation, without regard to the facts of each case or the particular documents at issue. See, e.g., Ashmead v. Harris, 336 N.W.2d 197, 201 (Iowa 1983); Harriman v. Maddocks, 518 A.2d 1027, 1033-34 (Me.1986)....
A growing number of courts have adopted a case-by-case approach, taking into consideration various factors to determine whether documents in an insurance claim file were prepared in anticipation of litigation. See, e.g., Spaulding v. Denton, 68 F.R.D. 342, 345-46 (D.Del.1975) (considering facts of each case to determine purpose of documents); Basinger v. Glacier Carriers, Inc., 107 F.R.D. 771, 774 (M.D.Pa.1985) (same); Haynes v. Anderson, 597 So.2d 615, 619 (Miss.1992) ("[C]ourts should consider `the nature of the documents, the nature of the litigation [and investigation], the relationship between the parties, and any other fact peculiar to the case.'" (alteration in original) (quoting Pete Rinaldi's Fast Foods v. Great American Ins., 123 F.R.D. 198, 202 (M.D.N.C.1988))).
In light of ... our previous cases, we find the case-by-case approach more sound in determining whether documents in an insurance claim file were prepared in anticipation of litigation. The trial court should consider the nature of the requested documents, the reason the documents were prepared, the relationship between the preparer of the document and the party seeking its protection from discovery, the relationship between the litigating parties, and any other facts relevant to the issue.
Askew, 918 P.2d at 473-474. See, Humphreys v. Caldwell, 888 S.W.2d 469 (Tex. 1994) (per curiam).[31]
With respect to the work product rule, we believe the position taken by the Supreme court of Utah in Askew, represents a viable and fair initial approach to documents in an insured's claim file that were generated prior to the date the third-party filing his/her underlying complaint against the insured. We, therefore, hold that in a third-party bad faith action where an insured has signed a release of his/her claim file to a third-party litigant,[32] documents in the insured's claim file that were generated prior to the filing date of a third-party's complaint against an insured are, upon a proper showing, protected by the work product rule. An insurer may raise the work product rule with respect to any document it believes is protected from disclosure by the work product rule. The work product rule belongs to the insurer and may be waived only by the insurer.[33]
We need to now carefully set out the boundaries of the work product rule as it applies to an insurer with respect to a third-party bad faith suit. As explained above with regard to the attorney-client privilege, prior to the filing of a third-party's underlying suit against the insured, the majority of documents in the claim file would likewise presumptively not fulfill the elements required to gain protection under the work product rule. Because the work product rule would presumptively apply to only a limited number of documents, if any, there would be little burden placed upon the court to conduct an examination of the documents for which the rule is evoked by the insurer. *93 Thus, a general request for production of documents prepared prior to the filing of the suit against the insured is appropriate. Where a third-party has obtained a release from the insured giving the third-party access to all pre-litigation documents in the insured's claim file, in order for the third-party to seek discovery of such documents the third-party need only make a general discovery request for such documents. If the insurer raises the work product rule with respect to any of the pre-litigation documents, the insurer must prove the elements of the work product rule for each document[34] it seeks to shield from discovery through assertion of the work product rule.
Following the criteria set forth in Askew v. Hardman, we hold additionally that when a trial court presiding over a third-party bad faith action makes its determination of whether a document was prepared in anticipation of litigation, the trial court should consider the nature of the requested documents, the reason the documents were prepared, the relationship between the preparer of the document and the party seeking its protection from discovery, the relationship between the litigating parties, and any other facts relevant to the issue. If the trial court determines that some or all of the requested pre-litigation documents have been shown to be protected from disclosure by the work product rule, then such documents are protected from disclosure by the work product rule.[35] Nevertheless, a third-party may obtain documents deemed protected by the work product rule only upon showing that he/she has a substantial need of the materials in the preparation of his/her case and that he/she is unable without undue hardship to obtain the substantial equivalent of the materials by other means.[36] To satisfy the work product rule substantial need and undue hardship tests, the third-party must show that a witness is no longer available for questioning, or is hostile and refuses to give a statement, or a witness has faulty memory.[37] Any protected document for which the third-party satisfies the work product rule substantial need and undue hardship tests must be produced to the third-party.
3. Application of the Quasi Attorney-Client Privilege and the Work Product Rule to This Case
We have determined that an insurer has standing to raise a quasi attorney-client privilege and the work product rule in an attempt to prevent disclosure of the contents of a claim file of an insured who has executed a release of the claim file to a third-party litigating a bad faith action against the insurer. Therefore, in the instant proceeding Allstate has standing to raise the quasi attorney-client privilege and work product rule in an attempt to prevent disclosure of 66 documents found in its insured's claim file. In view of the tests announced in this opinion, we prohibit the circuit court from releasing any of the 66 claim file documents until the circuit court has applied the appropriate tests set out in this opinion. On remand, the trial court must initially divide the documents into two categories: (1) documents generated before the date Ms. Thoburn filed her complaint against Mr. Mirandy, and (2) documents generated on and after the date Ms. Thoburn filed her complaint against Mr. Mirandy. Next, all pre-litigation claim file documents must go through the work product rule analysis; while all of the other claim file documents must go through the quasi attorney-client privilege analysis.[38]

*94 C.

Inadvertently Produced Document
Allstate inadvertently provided a two page document to Ms. Thoburn during discovery. Allstate seeks to bar further dissemination and use of that specific document on the grounds of attorney-client privilege. The circuit court denied Allstate's request for a protective order prohibiting further dissemination and use of the document. This issue appears to be one of first impression for this Court.[39]
Three approaches are used by courts to determine whether or not inadvertently disclosed attorney-client communication constitutes a waiver of the attorney-client privilege. The court in Gray v. Bicknell, 86 F.3d 1472 (8th Cir.1996) explained the three approaches as follows:
As noted by this Court in Pavlik v. Cargill, Inc., 9 F.3d 710, 713 (8th Cir. 1993), courts have generally followed one of three distinct approaches to attorney-client privilege waiver based on inadvertent disclosures: (1) the lenient approach, (2) the "middle of the road" approach ... and (3) the strict approach.
Under the lenient approach, attorney-client privilege must be knowingly waived. Here, the determination of inadvertence is the end of the analysis. The attorney-client privilege exists for the benefit of the client and cannot be waived except by an intentional and knowing relinquishment. Georgetown Manor, Inc. v. Ethan Allen, Inc., 753 F.Supp. 936, 938 (S.D.Fla.1991); see also Mendenhall v. Barber-Greene Co., 531 F.Supp. 951, 954 (N.D.Ill.1982) (holding that the better rule is that mere inadvertent production does not waive attorney-client privilege).... The lenient test creates little incentive for lawyers to maintain tight control over privileged material. While the lenient test remains true to the core principle of attorney-client privilege, which is that it exists to protect the client and must be waived by the client, it ignores the importance of confidentiality....
The second approach is known as the strict test. [The plaintiff] urges the Court to adopt such a test and refers to In re Sealed Case, 877 F.2d 976 (D.C.Cir.1989), a case describing the D.C. Circuit's strict test.... Under the strict test, any document produced, either intentionally or otherwise, loses its privileged status with the possible exception of situations where all precautions were taken. Once waiver has occurred, it extends "`to all other communications relating to the same subject matter.'" Id. at 981 (quoting In Re Sealed Case, 676 F.2d 793, 809 (D.C.Cir.1982)); Texaco Puerto Rico v. Dep't of Consumer Affairs, 60 F.3d 867 (1st Cir.1995).
While the strict test has some appeal in that it makes attorneys and clients accountable for their carelessness in handling privileged matters, [it should be rejected] because of its pronounced lack of flexibility and its significant intrusion on the attorney-client relationship.... There is an important societal need for people to be able to employ and fully consult with those trained in the law for advice and guidance. The strict test would likely impede the ability of attorneys to fill this need by chilling communications between attorneys and clients. If, when a document stamped "attorney-client privileged" is inadvertently released, it and all related documents lose their privileged status, then clients will have much greater hesitancy to fully inform their attorney.
Finally, there is the middle test, sometimes called the Hydraflow test.... Hydraflow, Inc. v. Enidine Inc., 145 F.R.D. 626, 637 (W.D.N.Y.1993). Under the Hydraflow test, the court undertakes a five-step analysis of the unintentionally disclosed document to determine the proper range of privilege to extend. These considerations are (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of *95 document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, and (5) whether the overriding interest of justice would be served by relieving the party of its error. Id.; see also Alldread v. City of Grenada, 988 F.2d 1425, 1433 (5th Cir. 1993). If, after completing this analysis, the court determines that waiver occurred, then those documents are no longer privileged. At the court's discretion, the privilege may also be determined to have been waived for related, but-as-yet undisclosed, documents.
[The middle] test strikes the appropriate balance between protecting attorney-client privilege and allowing, in certain situations, the unintended release of privileged documents to waive that privilege. The middle test is best suited to achieving a fair result. It accounts for the errors that inevitably occur in modern, document-intensive litigation, but treats carelessness with privileged material as an indication of waiver. The middle test provides the most thoughtful approach, leaving the trial court broad discretion as to whether waiver occurred and, if so, the scope of that waiver. It requires a detailed court inquiry into the document practices of the party who inadvertently released the document.
Gray, 86 F.3d at 1483-84. Most courts apply the Hydraflow test.[40]
We, too, believe that the Hydraflow test or "middle test" strikes the proper balance in determining on a case-by-case basis whether or not the inadvertent disclosure of attorney-client privileged communication constitutes a waiver of the privilege. Therefore, we hold that when attorney-client privileged documents are inadvertently disclosed during discovery, such disclosure does not in and of itself constitute a waiver of the privilege. In order to determine whether to apply the waiver doctrine to such disclosure trial courts must consider the following factors: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the extent of the disclosures, (4) the promptness of measures taken to rectify the disclosure, (5) whether the overriding interest of justice would be served by relieving the party of its error and (6) any other factors found to be relevant. We further hold that the party inadvertently disclosing attorney-client privileged communication bears the burden of showing by a preponderance of evidence *96 that the communication should retain its privileged status. The trial court's determination of this issue will not be reversed absent an abuse of discretion.
In the instant proceeding the trial court did not have the benefit of the Hydraflow test when it denied Allstate's motion for a protective order on the inadvertently disclosed document. We therefore set aside the trial court's order denying a protective order. On remand the trial court must hold a hearing on the motion for a protective order and apply the Hydraflow test in determining whether to issue a protective order on the inadvertently disclosed document.[41]

IV.

CONCLUSION
In view of the foregoing we find as follows: (1) the circuit court's orders requiring production of documentation of all nationwide complaints, nationwide production of all regulatory sanctions filed against Allstate and the production of nationwide advertising and advertising materials by Allstate failed to set out findings of fact and conclusions of law consistent with a Stephens analysis, therefore on remand the trial court must clearly articulate in its order the Stephens analysis for this specific discovery; (2) the circuit court is prohibited from requiring disclosure of any of the 66 documents from the claim file of Allstate's insured until it has engaged in the quasi attorney-client privilege and work product rule analysis set out in this opinion; and (3) the circuit court's denial of Allstate's motion for an order of protection for the document inadvertently disclosed is set aside and on remand the circuit court must apply the Hydraflow test adopted in this opinion to determine whether the waiver doctrine applies to the inadvertently disclosed document.
Writ Granted as Moulded.
NOTES
[1] According to the brief of Ms. Thoburn, prejudgment interest increased the verdict to $251, 726.05.
[2] Ms. Thoburn was not insured by Allstate.
[3] Allstate removed the case to federal court. The case was remanded to Ohio County circuit court as Allstate was unable to prove that Ms. Thoburn fraudulently joined other defendants to defeat diversity of jurisdiction. Ms. Thoburn named several employees of Allstate as additional defendants.
[4] The relevant sections in W.Va.Code § 33-11-4(9) provide as follows:

(9) Unfair claim settlement practices.No person shall commit or perform with such frequency as to indicate a general business practice any of the following:
(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;
(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
(f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds, when such insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;
(h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;
...
(m) Failing to promptly settle claims, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.
[5] Both parties agree that Ms. Thoburn requested only statewide complaints. The circuit court ordered a nationwide production.
[6] Apparently, Ms. Thoburn requested locally disseminated advertisements. The circuit court ordered the production of advertisements of both a local and national origin.
[7] Both parties agree that Ms. Thoburn requested all sanctions imposed against Allstate throughout the State of West Virginia. The circuit court ordered the production of sanctions against Allstate on a nationwide basis.
[8] Allstate retained 137 documents from Mr. Mirandy's claim file. After an in camera review of the privilege logs on each of the documents retained, the circuit court ordered Allstate to produce 66 of the documents.
[9] See also, Syl. pt. 4, State ex rel. Hoover v. Berger, 199 W.Va. 12, 483 S.E.2d 12 (1996) ("In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.").
[10] Ms. Thoburn's brief asserts that she "withdraws" the requirement for a nationwide production of documents. Ms. Thoburn originally requested only a statewide production of documents from the circuit court. However, the orders entered by the circuit court compel a nationwide production of documents. "Under Rule 37(b)(2)(D) of the West Virginia Rules of Civil Procedure, a court has the power to find a party in contempt for failure to obey a discovery order[.]" Syl. Pt. 5, Stephens. Ms. Thoburn did not motion the circuit court to rescind or amend that part of its orders requiring the nationwide production of written complaints filed against Allstate. Ms. Thoburn cannot negate the circuit court's orders compelling the nationwide production of documents. Therefore, this Court will analyze the issue based upon the actual contents of the circuit court orders.
[11] Allstate submitted an affidavit stating the cost of compiling only the complaint information from West Virginia to be approximately $2 million dollars.
[12] Counsel for Ms. Thoburn indicated during oral argument that we should not give insurers standing to raise the attorney-client privilege/work product rule to protect disclosure of the files of insureds who have consented to the release of such files. Ms. Thoburn argues that because the State Insurance Commissioner has access to such files by statutory authorization the same is not privileged information. The argument is without merit for two reasons. First, W.Va.Code § 33-2-9 (1957) authorizes general access to the records of insurance companies by the Insurance Commissioner. This Court has not previously ruled upon the issue of what, if any, privilege attaches to the records of insurance companies vis-a-vis the Insurance Commissioner's general statutory right to inspect such records. Ms. Thoburn contends the attorney-client privilege/work product rule do not bar the statutory right of inspection of the Insurance Commissioner. This issue is not properly before this Court, insofar as Allstate has not sought a writ of prohibition against the Insurance Commissioner in this proceeding. Therefore, we decline to rule upon what, if any, privileges attach to records of insurance companies that would prevent the Insurance Commissioner from having access to such records. Second, while the Insurance Commissioner has been granted statutory access to the records of insurance companies, Ms. Thoburn has cited no statute that would give her access to Mr. Mirandy's claim file. The legislature undoubtedly saw a need to grant the Insurance Commissioner general access to insurance company records. We discern no legislative intent, by way of a statute, which gives the general public access to all records kept by insurance companies.
[13] We pointed out in Light v. Allstate Insurance Co., 203 W.Va. 27, 30 n. 5, 506 S.E.2d 64, 67 n. 5 (1998) that "[t]he phrase `bad faith' is used to refer to the state's `unfair settlement practices' statute. However, there is actually a technical distinction between a `bad faith' claim and an `unfair settlement practices' claim. The phrase `bad faith' was developed to describe the common law action against an insurer. The phrase `unfair settlement practices' was developed to describe the statutory action against an insurer. Because the statutory claim actually includes the elements of a cause of action for the common law claim, our cases use the two phrases interchangeably. See e.g., State ex rel. West Virginia Fire & Cas. Co. v. Karl, 199 W.Va. 678, 487 S.E.2d 336 (1997); Dodrill v. Nationwide Mut. Ins. Co., 201 W.Va. 1, 491 S.E.2d 1 (1996); McCormick v. Allstate Ins. Co., 197 W.Va. 415, 475 S.E.2d 507 (1996); State ex rel. Motorists Mut. Ins. Co. v. Broadwater, 192 W.Va. 608, 453 S.E.2d 591 (1994); Berry v. Nationwide Mut. Fire Ins. Co., 181 W.Va. 168, 381 S.E.2d 367 (1989). As a result of the historical lack of distinction between the two phrases ... we see no need to deviate from our traditional practice of using the two phrases interchangeably."
[14] Examples of first-party insurance bad faith settlement cases decided by this Court include: Light v. Allstate Insurance Co., 203 W.Va. 27, 506 S.E.2d 64 (1998); Miller v. Fluharty, 201 W.Va. 685, 500 S.E.2d 310 (1997); State ex rel. West Virginia Fire & Cas. Co. v. Karl, 199 W.Va. 678, 487 S.E.2d 336 (1997) (not clear from opinion but appears to be two consolidated first party bad faith actions); McCormick v. Allstate Ins. Co., 197 W.Va. 415, 475 S.E.2d 507 (1996); Marshall v. Saseen, 192 W.Va. 94, 450 S.E.2d 791 (1994); Morrison v. Haynes, 192 W.Va. 303, 452 S.E.2d 394 (1994); State Farm Mut. Auto. Ins. Co. v. Stephens, 188 W.Va. 622, 425 S.E.2d 577 (1992); Ball v. Life Planning Services, Inc., 187 W.Va. 682, 421 S.E.2d 223 (1992); Thompson v. West Virginia Essential Property Ins. Ass'n, 186 W.Va. 84, 411 S.E.2d 27 (1991); Robinson v. Fidelity & Deposit Co., 181 W.Va. 463, 383 S.E.2d 95 (1989); Berry v. Nationwide Mut. Fire Ins. Co., 181 W.Va. 168, 381 S.E.2d 367 (1989); Romano v. New England Mut. Life Ins. Co., 178 W.Va. 523, 362 S.E.2d 334 (1987); Hayseeds, Inc. v. State Farm Fire & Cas., 177 W.Va. 323, 352 S.E.2d 73 (1986); Mutafis v. Erie Ins. Exchange, 174 W.Va. 660, 328 S.E.2d 675 (1985).
[15] Most courts which have considered a third-party bad faith action have not allowed such a third-party claim against a tortfeasor's insurer. See Messina v. Nationwide Mutual Ins. Co., 998 F.2d 2 (D.C.Cir.1993); McFadden v. Liberty Mutual Ins. Co., 803 F.Supp. 1178 (N.D.Miss.1992), aff'd, 988 F.2d 1210 (5th Cir.1993); Earth Scientists v. United States Fidelity & Guar., 619 F.Supp. 1465 (D.Kan.1985); Wilson v. Wilson, 121 N.C.App. 662, 468 S.E.2d 495 (N.C.App. 1996); Dvorak v. American Family Mutual Ins. Co., 508 N.W.2d 329 (N.D.1993); Herrig v. Herrig, 844 P.2d 487 (Wy.1992); Gunny v. Allstate Ins. Co., 108 Nev. 344, 830 P.2d 1335 (1992); Bates v. Allied Mutual Ins. Co., 467 N.W.2d 255 (Iowa 1991); City of Farmington v. L.R. Foy Const. Co., 112 N.M. 404, 816 P.2d 473 (1991); O.K. Lumber Co., Inc. v. Providence Washington Ins. Co., 759 P.2d 523 (Alaska 1988); Moradi-Shalal v. Fireman's Fund Ins. Cos., 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58 (1988); Morris v. American Family Mutual Ins. Co., 386 N.W.2d 233 (Minn.1986); Tank v. State Farm Fire & Casualty Co., 105 Wash.2d 381, 715 P.2d 1133 (1986); Wilder v. Aetna Life & Casualty Ins. Co., 140 Vt. 16, 433 A.2d 309 (1981); Kranzush v. Badger State Mutual Casualty Co., 103 Wis.2d 56, 307 N.W.2d 256 (1981); Scroggins v. Allstate Ins. Co., 74 Ill.App.3d 1027, 30 Ill.Dec. 682, 393 N.E.2d 718 (1979); Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 392 A.2d 576 (1978); Farris v. U.S. Fidelity and Guaranty Co., 284 Or. 453, 587 P.2d 1015 (1978).
[16] Examples of third-party insurance bad faith settlement cases decided by this Court include: Dodrill v. Nationwide Mut. Ins. Co., 201 W.Va. 1, 491 S.E.2d 1 (1996); State ex rel. State Farm Fire & Casualty v. Madden, 192 W.Va. 155, 451 S.E.2d 721 (1994); Poling v. Motorists Mut. Ins. Co., 192 W.Va. 46, 450 S.E.2d 635 (1994); Russell v. Amerisure Ins. Co., 189 W.Va. 594, 433 S.E.2d 532 (1993), overruled on other grounds, Madden; Robinson v. Continental Cas. Co., 185 W.Va. 244, 406 S.E.2d 470 (1991), overruled on other grounds, Madden; Grove By and Through Grove v. Myers, 181 W.Va. 342, 382 S.E.2d 536 (1989); Jenkins v. J.C. Penney Casualty Ins. Co., 167 W.Va. 597, 280 S.E.2d 252 (1981), overruled on other grounds, Madden.
[17] In the context of first-party bad faith actions against insurers, courts generally agree that the attorney-client privilege/work product rules do not attach to an insured's file because the insurer created the file primarily on behalf of the insured. Therefore, in a first-party bad faith action against an insurer, the insured generally has access to all documents in his/her file. See DiCenzo v. Izawa, 68 Haw. 528, 723 P.2d 171 (Haw.1986); Longs Drug Stores v. Howe, 134 Ariz. 424, 657 P.2d 412 (Ariz.1983); Alseike v. Miller, 196 Kan. 547, 412 P.2d 1007 (Kan.1966); Jacobi v. Podevels, 23 Wis.2d 152, 127 N.W.2d 73 (Wis.1964); Rogers v. Aetna Casualty & Surety, 601 F.2d 840 (5th Cir.1979); Baker v. CNA Ins. Co., 123 F.R.D. 322, 326 (D.Mont.1988); Jackson v. Kroblin Refrigerated Xpress, 49 F.R.D. 134 (N.D.W.Va.1970). This opinion does not address the extent to which an insured has access to documents in his/her claim file in a first-party bad faith action against an insurer. There are two types of first-party bad faith actions against an insurer. One such action may arise when the insurer fails to use good faith in settling a claim by someone the insured harmed or injured. In this context, the interests of the insured and insurer are presumptively mutual. However, the second type of first-party bad faith action against an insurer concerns a claim brought by the insured against the insurer, e.g., house burned down. In this second type of first-party bad faith action, the interest of the insured and insurer are actually presumptively in conflict. Because the interests of the insured and insured may in fact be inconsistent in a first-party bad faith action, we decline to decide the extent to which the attorney-client privilege/work product rules apply to the claim file of an insured in a first-party bad faith action against an insured. See State ex rel. West Virginia Fire & Cas. Co. v. Karl, 199 W.Va. 678, 683 n. 6, 487 S.E.2d 336, 343 n. 6 (1997) (a first-party bad faith settlement case in which this Court declined to address the issue of whether the plaintiffs in that case could pursue discovery of claim files of other similarly situated insureds).
[18] The unfair trade practices statute in Florida requires showing a general business practice in a bad faith claim against an insurer. See Fla. Stat. Ann. § 626.9541(1)(i)(3) (1996).
[19] Montana's unfair trade practices statute is similar to West Virginia's in requiring a showing of a "general business" practice to establish a bad faith claim. See Mont.Code Ann. § 33-18-201 (1997).
[20] This Court held in syllabus point 5 of Kirchner v. Smith, 61 W.Va. 434, 58 S.E. 614 (1907) that:

An attorney employed by two or more persons to give professional advice or assistance in a matter in which they are mutually interested can, on litigation subsequently arising between such persons or their representatives, be examined as a witness, at the instance of either, as to communications made when he was acting as attorney for all, although he could not disclose such communications in a controversy between his clients or either of them, and third persons.
[21] The attorney-client privilege belongs to the client. "`A client ... cannot be compelled, and a legal adviser ... will not be allowed without the express consent of his client, to disclose oral or documentary communications passing between them in professional confidence.'" Franklin D. Cleckley, A Modest Proposal: A Psychotherapist-Patient Privilege for West Virginia, 93 W.Va. L.Rev. 1, 12 n. 39 (1990), quoting, S. Phipson, Phipson on the Law of Evidence 203 (9th ed.1952). "When the privilege is applicable... it is absolute." Franklin D. Cleckley, 1 Handbook on Evidence for West Virginia Lawyers, § 5-4(E)(3) (3d ed.1994).
[22] This opinion does not address the issue of a third-party seeking the claim file of an insured who has not executed such a release.
[23] A third-party may make a general request for all communication in the insured's claim file generated before the filing date of the complaint against the insured. See the discussion on work product in § 2(b), infra.
[24] We held in syllabus point 2 of State v. Burton, 163 W.Va. 40, 254 S.E.2d 129 (1979) that "[i]n order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from that attorney in his capacity as a legal advisor; (3) the communication between the attorney and client must be identified to be confidential."
[25] In its appellate brief, Allstate distinguishes between documents prepared in connection with the representation of their insured in the suit against him, and documents prepared in connection with an investigation of a possible underinsured motorist claim. We do not find such a distinction to be relevant. Thus, it does not change the status of the documents with regard to the attorney-client privilege.
[26] There are certain limited circumstances when documents covered by the attorney-client privilege are discoverable. See 1 Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 5-4(E)(6)(a)-(f), at 578-582 (3d ed.1994).
[27] The distinction between the traditional common law attorney-client privilege and the quasi attorney-client privilege resides in the ability to obtain quasi attorney-client privilege communication through a showing of compelling need; such a showing cannot pierce the traditional common law attorney-client privilege. For a discussion of the traditional common law attorney-client privilege see, Note, The Attorney-Client Privilege in West Virginia, 54 W.Va. L.Rev. 297 (1952).
[28] In a few of our third-party bad faith actions against insurers, the facts of those cases revealed disclosure during trial of attorney-client and work product information. See Dodrill v. Nationwide Mut. Ins. Co., 201 W.Va. 1, 491 S.E.2d 1 (1996). However, none of our previous cases required this Court to determine whether such communications were discoverable. Where a party does not assign a matter as error this Court generally will not address matters that may have in fact been error.
[29] As previously noted, the attorney-client privilege may be raised to protect documents created after a lawsuit has been filed.
[30] A third-party bad faith action in Utah was created by and is governed by case law, not statute. See Beck v. Farmers Ins. Exch., 701 P.2d 795 (Utah 1985); Campbell v. State Farm Mutual Automobile Insurance Company, 840 P.2d 130 (Utah App.1992).
[31] The bad faith settlement statute in Texas does not require showing a general business practice. See Tex. Ins.Code Ann., art. 21.21 § 4(10) (Supp. 1998).
[32] This opinion does not address the issue of a third-party seeking the claim file of an insured, when the insured has not executed a release of his/her claim file to a third-party suing an insurer in a bad faith action.
[33] "Unlike the attorney-client privilege, ... the work product doctrine is designed for the attorney's sake." Franklin D. Cleckley, 1 Handbook on Evidence for West Virginia Lawyers, § 5-4(E)(3) (3d ed.1994). That is, the attorney has the exclusive authority to invoke the work product rule. The decision in this opinion places that authority with the insurer.
[34] While we require the insurer to prove the elements of the work product rule for each document, we note that the trial court has the discretion to group together similar documents, and to allow the insurer to present proof of work product as to an entire group so designated, rather than its individual parts.
[35] If the insurer fails to establish all the elements of the work product rule for any requested prelitigation document, then such document must be produced to the third-party.
[36] See Rule 26(b)(3) of the West Virginia Rules of Civil Procedure.
[37] See State ex rel. Chaparro v. Wilkes, 190 W.Va. 395, 438 S.E.2d 575 (1993); In re Markle, 174 W.Va. 550, 328 S.E.2d 157 (1984).
[38] The record does not inform this Court whether any or all of the post-litigation claim file documents have been specifically or descriptively requested by Ms. Thoburn. The trial court is instructed to apply the quasi attorney-client privilege analysis only to those post-litigation claim file documents that have been specifically requested.
[39] This Court held in syllabus point 12 of Marano v. Holland, 179 W.Va. 156, 366 S.E.2d 117 (1988) "that the attorney-client privilege may be waived if disclosure of privileged communications is made to third parties."
[40] See U.S. v. United Technologies Corp., 979 F.Supp. 108 (D.Conn.1997); In re Southeast Banking Corp. Securities and Loan Loss Reserves Litigation, 212 B.R. 386 (S.D.Fla.1997); Draus v. Healthtrust, Inc., 172 F.R.D. 384 (S.D.Ind.1997); Aramony v. United Way of America, 969 F.Supp. 226 (S.D.N.Y.1997); Fidelity and Deposit Co. of Maryland v. McCulloch, 168 F.R.D. 516 (E.D.Pa. 1996); Harmony Gold U.S.A., Inc. v. FASA Corp., 169 F.R.D. 113 (N.D.Ill.1996); In re Grand Jury Subpoena, 925 F.Supp. 849 (D.Mass.1995); Ciba-Geigy Corp. v. Sandoz Ltd., 916 F.Supp. 404 (D.N.J.1995); Berg Electronics, Inc. v. Molex, Inc., 875 F.Supp. 261 (D.Del.1995); U.S. v. Keystone Sanitation Co., Inc., 885 F.Supp. 672 (M.D.Pa.1994); Edwards v. Whitaker, 868 F.Supp. 226 (M.D.Tenn.1994); Cunningham v. Connecticut Mut. Life Ins., 845 F.Supp. 1403 (S.D.Cal.1994); Apex Mun. Fund v. N-Group Securities, 841 F.Supp. 1423 (S.D.Tex.1993); Shriver v. Baskin-Robbins Ice Cream Co., Inc., 145 F.R.D. 112 (D.Colo.1992); In re Grand Jury Investigation, 142 F.R.D. 276 (M.D.N.C.1992); Federal Deposit Ins. Corp. v. Ernst & Whinney, 137 F.R.D. 14 (E.D.Tenn.1991); Georgetown Manor, Inc. v. Ethan Allen, Inc., 753 F.Supp. 936 (S.D.Fla.1991); Monarch Cement Co. v. Lone Star Industries, Inc., 132 F.R.D. 558 (D.Kan. 1990); Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc., 132 F.R.D. 204 (N.D.Ind. 1990); Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 116 F.R.D. 46 (M.D.N.C.1987); Abamar Housing and Development, Inc. v. Lisa Daly Lady Decor, Inc., 698 So.2d 276 (Fla.App. 3 Dist.1997); Hebert v. Anderson, 681 So.2d 29 (La.App. 4 Cir. 1996); GPL Treatment, Ltd. v. Louisiana-Pacific Corp., 133 Or.App. 633, 894 P.2d 470 (Or.App.1995); Trilogy Communications, Inc. v. Excom Realty, Inc., 279 N.J.Super. 442, 652 A.2d 1273 (N.J.Super.1994); PacifiCorp v. Department of Revenue of State of Montana., 254 Mont. 387, 838 P.2d 914 (Mont.1992); John Blair Communications, Inc. v. Reliance Capital Group, L.P., 182 A.D.2d 578, 582 N.Y.S.2d 720 (1992); Hartman v. El Paso Natural Gas Co., 107 N.M. 679, 763 P.2d 1144 (N.M.1988); Sterling v. Keidan, 162 Mich. App. 88, 412 N.W.2d 255 (Mich.App.1987). For other cases applying the strict test see, Wichita Land & Cattle Co. v. American Federal Bank, F.S.B., 148 F.R.D. 456 (D.D.C.1992); F.D.I.C. v. Singh, 140 F.R.D. 252 (D.Me.1992). For other cases applying the lenient test see, Farm Credit Bank of St. Paul v. Huether, 454 N.W.2d 710 (N.D.1990); In re Sealed Case, 120 F.R.D. 66 (N.D.Ill.1988).
[41] The inadvertently disclosed document was not tendered to this Court. During oral argument Allstate indicated one copy of the document was enclosed in one of the nine sealed privilege log packets. The Court is unable to locate the document in the record before the Court. If the document did not come from the claim file of Mr. Mirandy, then the trial court need not go beyond the Hydraflow test in disposing of the issue. However, if the document came from Mr. Mirandy's claim file the trial court must proceed as follows. First, Ms. Thoburn knows what the document is and is requesting to keep it. Therefore, the trial court must initially perform a quasi attorney-client privilege analysis. Second, if the document is found to be protected by the quasi attorney-client privilege and Ms. Thoburn fails to show a substantial need for the document, then the trial court must perform the Hydraflow test. On the other hand, if the document is found to be protected by the quasi attorney-client privilege and Ms. Thoburn establishes a substantial need for the document, then the trial court need not perform the Hydraflow test.